Filed 10/31/24  In re Adam S. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ADAM S. et al., Persons Coming Under the Juvenile Court Law. | B334088<br><br>(Los Angeles County Super. Ct. No. 18CCJP03032B-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ISAMAR M.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lucia Murillo, Judge Pro Tempore.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

In over 100 pages of briefing in this dependency case, a mother challenges nearly every order the juvenile court issued in exerting dependency jurisdiction over her four children. All of her arguments lack merit, and many frivolously ignore the record or the governing law. We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The family*

Isamar M. (mother) has four children at issue in this appeal—Adam S. (born April 2015), Ruben G. (born April 2018), Matthew G. (born April 2019), and Samara G. (born July 2023). Adam's father is Javier S.; the father of the younger three children is Eriverto G. (father). Mother's fifth child, Carly M. (born October 2011), is not at issue in this appeal because a juvenile court previously terminated mother's parental rights over her.

#### B. *Mother's physical abuse of Adam, Ruben, and Matthew*

Mother "smacks" and "hits" Adam, Ruben, and Matthew nearly every day, causing bruises and marks on their bodies. Mother does this when she "gets mad" or when the children do not follow her household rule to "be quiet as a mouse." She has

2

used her hands, a belt, a broom and other items lying around the house.  When mother has lashed Ruben with a belt, she used the "golden" part (that is, the buckle).  Mother has also pushed Adam to the floor and held his face down to the ground; smacked Adam, Ruben and Matthew on the mouth; hit Adam with a broom because his hair was unkempt; struck Adam, Ruben and Matthew with a sandal; and slammed a tablet on Adam's knee hard enough to break the screen protector.  These injuries often cause bruising.  When mother strikes Ruben, he "cries bad" and the blows "hurt[] really much."  When mother strikes Matthew, he cries.  When mother struck Ruben in the mouth in September 2023, Adam finally "got sick of it" and snuck out of the house with Ruben because "he did not want [them] to get hit anymore."  The two young boys walked to a relative's house a half mile away in the pre-dawn darkness.

When confronted about these beatings, mother's responses have been inconsistent.  Initially, she denied ever striking the boys under any circumstances, and "rant[ed]" that Adam is a "liar" who "lies to everyone" and "mak[es] stuff up all the time."  Later, mother admitted that she would (1) "spank[]" the children on "the behind" with an open hand, but only as a last resort when they are behaving "inappropriate[ly]," and (2) threaten to smack them on the mouth or to hit them with her sandal but never followed through.

Although Adam reported the physical abuse to family members, his therapist, and the police, Adam temporarily denied some of the abuse to the Los Angeles Department of Children and Family Services (the Department), stating his conduct in running away (which was verified by the relative) was all a dream; the recantation occurred after mother reminded him that "[w]hatever

happens, stays in the house." Adam subsequently reaffirmed to the Department that the abuse occurred. Ruben never recanted in interviews with the Department, despite mother telling him that he and his siblings will be taken away if he tells the truth.

### C.    *Mother's emotional abuse of Adam*

Mother believes that "everything [Adam] touches becomes a disaster." She singles him out as a "problem child" and blames him for being "a bad influence" on his siblings. Mother repeatedly tells Adam he is "stupid" and "dumb."

This conduct has adversely affected Adam. Adam has a therapist who treats him for the "reactions" he experiences to "severe stress." Whenever the therapist tries to discuss these issues with mother, mother pulls him out of therapy because she believes Adam is too young for a diagnosis of post-traumatic stress disorder. Adam also is behind in school and fights with classmates. He acts "nervous and anxious" at school when he believes he will get into trouble for a mistake. Adam has walked to school by himself, while ill, simply because he did not want to stay home.

Mother is "sick of [Adam's] behavior," and has offered to "sign" away her parental rights over him.

### D.    *History of domestic violence*

Mother and father regularly yell and curse at one another, and this verbal aggression has repeatedly escalated into physical violence. In 2020, father slammed a door on mother's finger and broke it. In June 2022, father grabbed and pushed mother. Around the same time, mother jammed a Q-tip into father's ear, causing it to bleed. In December 2022, father chucked Matthew's baby bottle at mother's head and hit her. In June or July 2023,

4

father hit mother while she was at least eight months pregnant with Samara.

This conduct is consistent with mother's and father's prior conduct. Mother regularly engaged in "violent altercations" and "assaultive behavior" with Adam's father in front of Adam and Carly. Father has criminal convictions for battering the paternal grandmother and paternal aunt.

When questioned about this domestic violence, mother says she does not recall any incidents and prefers to not "live in the past."

## II.    Procedural Background

### A.    *Petition*

In October 2023, the Department filed a petition asking the juvenile court to exert jurisdiction over the four children on the grounds that (1) mother's "physical abuse" of Adam, Ruben, and Matthew was "excessive" and caused the children "unreasonable pain and suffering," thereby placing them as well as Samara at risk of serious physical harm, damage, danger, and abuse (rendering jurisdiction appropriate under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), and (j)),[1] (2) mother's "ongoing emotional abuse" of Adam places him "at substantial risk of suffering serious damage" (rendering jurisdiction appropriate under section 300, subdivision (c)), and (3) mother's and father's "history of engaging in violent altercations" and mother's failure to protect the children

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

5

endanger their physical health and safety (rending jurisdiction appropriate under section 300, subdivision (b)(1)).[2]

**B.** *Jurisdictional and dispositional hearing*

The juvenile court held a combined jurisdictional and dispositional hearing on December 14, 2023. Mother continued to deny "ever abusing her children, whether verbally or physically." The court sustained the allegations, removed all four children from mother, and granted mother monitored visitation of three hours, three times per week. The court ordered the Department to provide mother reunification services, and defined mother's case plan to include (1) completing a domestic violence support program, (2) completing an anger management program, (3) completing a parenting class focused on special needs children, and (4) participating in conjoint counseling with Adam as well as individual counseling to address parenting a child with special needs and the effects on children of excessive discipline and domestic violence.

**C.** *Appeal*

Mother filed this timely appeal.

---

[2] The Department further alleged that the domestic violence ground supported jurisdiction under subdivision (a) of section 300, but the juvenile court dismissed that allegation.

As against father, the Department alleged the domestic violence ground and a separate physical abuse ground as to Adam. Father pleaded no contest to the domestic violence ground, and the juvenile court dismissed the physical abuse ground. Father did not appeal.

**D.** *Post-appeal developments*[3]

While this appeal was pending, the juvenile court on June 13, 2024 placed Ruben, Matthew, and Samara back in mother's custody.

## DISCUSSION

On appeal, mother attacks (1) the substantiality of the evidence supporting each ground on which the juvenile court exerted dependency jurisdiction over her four children; (2) nearly every aspect of the court's dispositional orders, including (a) the order removing the children from her custody, (b) the order restricting her to monitored visitation, and (c) the order defining her case plan to include completing a domestic violence program, parenting class, and individual counseling; and (3) the Department's compliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.; § 224 et seq.).

## I. Exertion of Dependency Jurisdiction

We review a juvenile court's finding of dependency jurisdiction for substantial evidence, asking whether the record—when viewed as a whole and drawing all inferences in support of the court's findings—contains "'sufficient facts to support'" the court's jurisdictional findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Where, as here, the court's exertion of dependency jurisdiction rests on several grounds, we need only find substantial evidence to support one ground. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *I.J.*, at p. 773.)

Here, substantial evidence supports the exertion of jurisdiction over all four children based on mother's physical

---

[3] We grant the Department's request for judicial notice of the orders documenting these post-appeal developments. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

7

abuse of Adam, Ruben and Matthew and the resulting danger to Samara.

Dependency jurisdiction is appropriate when (1) a parent engages in inappropriate physical discipline that (2) gives rise to a substantial risk that the child will suffer serious physical harm. (§ 300, subds. (a), (b)(1); *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 (*Rocco M.*), overruled on other grounds in *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*).) Because parents in California have ""'a right to reasonably discipline [their] child and may administer reasonable punishment"'" (*In re D.M.* (2015) 242 Cal.App.4th 634, 640-641 (*D.M.*)), the juvenile court must assess whether the discipline at issue has crossed the line separating reasonable and appropriate parental discipline (which will not support dependency jurisdiction) from inappropriate "parental discipline" (which will). (*Id.* at p. 641.) Whether that line has been crossed in a particular case "turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'" (*Ibid.*) Dependency jurisdiction is appropriate over the child's sibling if the child "has been abused or neglected" under, as pertinent here, subdivisions (a) or (b) of section 300 and "there is a substantial risk that the [sibling] will be abused or neglected" under that same provision. (§ 300, subd. (j); *I.J.*, *supra*, 56 Cal.4th at p. 774.)

Substantial evidence supports the juvenile court's finding that Adam, Ruben, and Matthew were physically beaten. Substantial evidence supports the juvenile court's finding that these beatings were not a product of appropriate parental discipline because mother was often "mad" when she beat the

8

children (which tends to refute a thoughtful, disciplinary reason for administering the beatings), and the frequency and degree of punishments—which employed everything from belt buckles to brooms, and caused bruising and pain—was unreasonable and excessive. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438 [parent's use of a belt on a three year old's body that left marks on one occasion; jurisdiction appropriate]; see also *In re A.E.* (2008) 168 Cal.App.4th 1, 4 ["[s]mall children are not to be hit with hard objects, especially to the point of leaving black and blue bruises"].) Substantial evidence supports the juvenile court's finding that all three children—and hence their sibling Samara—are at substantial risk of similar harm in the future because mother has a long history of administering these beatings, has been less than forthright in admitting that they happen, and has encouraged the children to lie about whether they have occurred.

Mother responds with three arguments.

First, she contends that she engaged in no more than age-appropriate spanking beyond the jurisdictional reach of the juvenile court. Construed in favor of the juvenile court's order, the record is squarely to the contrary and we decline to revisit the juvenile court's implicit finding that the children were more credible than mother. (*R.T.*, *supra*, 3 Cal.5th at p. 633 ["'issues of . . . credibility are the province of the [juvenile] court'"].) Mother relatedly asserts that she was *justified* in beating Adam because he is "an unruly child." Mother provides no support for her frankly offensive assertion that special needs children should be accorded a different—and, indeed, lesser—level of protection from parental beating than other children.

Second, mother argues that the juvenile court based its jurisdictional finding on the impermissible "categorical view" that

9

hitting children is inappropriate physical discipline. (See *D.M.*, *supra*, 242 Cal.App.4th at p. 637 [juvenile court may not base jurisdiction on "categorical view that 'hitting children with shoes' is 'physical abuse' and 'not a proper form of discipline'"].) This argument is contradicted by the record. The juvenile court explicitly considered mother's reasons for striking the children (namely, that she was "mad"), which is only relevant when balancing the pertinent factors.

Third, mother argues that her physical discipline did not cause "serious physical harm" to the children. This is wrong for two reasons. To begin, there *was* serious physical harm, including bruising and pain sufficient to induce crying. More broadly, the imposition of serious physical harm is not required; the *risk* of such is sufficient (*I.J.*, *supra*, 56 Cal.4th at p. 773 ["'The court need not wait until a child is . . . injured to assume jurisdiction'"]; *In re R.V.* (2012) 208 Cal.App.4th 837, 843 [same]), and here there was substantial evidence of such risk.

Because there is one sufficient basis for jurisdiction, we need not consider the parties' arguments regarding the other bases.

## II. Dispositional Orders

### A. *Removal of children from mother's custody*

Mother challenges the juvenile court's order removing all four children from her custody.

This challenge is moot as to Ruben, Matthew, and Samara. Because the juvenile court subsequently placed those three children back in mother's custody, the court effectively negated its earlier removal order as to those three children and her challenge is, to that extent, moot. (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)

The challenge lacks merit as to Adam.

Once a juvenile court exerts dependency jurisdiction over a child, the court may remove the child from his parent if it finds, by clear and convincing evidence, that (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home," and (2) "there are no reasonable means" short of removal "by which the [child]'s physical health can be protected." (§ 361, subd. (c)(1); Cal. Rules of Court, rule 5.695(c)(1).) We review a removal order for substantial evidence. (*R.T.*, *supra*, 3 Cal.5th at p. 633.)

Substantial evidence supports the juvenile court's finding that Adam would be in substantial danger to his physical or emotional well-being if returned to mother. The substantial evidence that supports the juvenile court's exercise of dependency jurisdiction—namely, the evidence that mother regularly engaged in physical violence against Adam—also, on the facts of this case, supports the finding by clear and convincing evidence that Adam faces a substantial danger of harm if left in mother's custody. (See *Rocco M.*, *supra*, 1 Cal.App.4th at p. 826 ["[s]ince the evidence warranted a finding of substantial risk of serious physical injury, it also appears to have supported a finding under section 361 . . . of a substantial danger to the minor's physical health"].) What is more, the risk of mother continuing to engage in such conduct and to encourage Adam not to report it is substantial in light of her repeated refusals to acknowledge that violence and her insistence that the children not tell others what she is doing. Minimization and denial of conduct are evidence of continued risk. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) Mother insists that she is a "good mom" and that Adam

11

felt "safe at home," but neither a parent's estimation of her parenting skills nor a child's subjective feelings of safety negate or even undermine the otherwise substantial evidence that Adam faces risk of continued physical violence if left in mother's custody.

Substantial evidence also supports the juvenile court's finding that no reasonable means short of removal can protect Adam. Mother's denial of any violence and willingness to encourage Adam not to report violence mean that the lesser alternatives mother proposes—leaving Adam in her custody but offering her wraparound services or therapy—will not suffice to protect Adam because any further violence will go unreported by mother and Adam.

### B. *Monitored visitation*

Mother challenges the juvenile court's requirement that her visitation with the children be monitored. As noted above, this challenge is moot as to Ruben, Matthew, and Samara because those children are now back in mother's custody (and hence no longer subject to any visitation order). (*D.P.*, *supra*, 14 Cal.5th at p. 276.)

The challenge lacks merit as to Adam.

When a juvenile court removes a child from his parent with the eventual goal of reunification, the court should provide for visitation between the parent and child "consistent with the well-being of the child" unless doing so will "jeopardize the safety of the child." (§ 362.1, subd. (a)(1).) We review a trial court's order regarding visitation for an abuse of discretion. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119.)

The juvenile court did not abuse its discretion in requiring that mother's visitation with Adam be monitored. In light of the

evidence that mother repeatedly inflicted physical violence on Adam, repeatedly belittled and ostracized him, repeatedly denied doing so or minimized her conduct, and repeatedly urged Adam not to report any of her actions, the court did not act unreasonably in concluding that it was necessary for a monitor to be present during mother's visits with Adam. Mother used to hit Adam during his unmonitored visits with her during the pendency of a prior dependency case; the juvenile court was within its rights to believe that past might be prologue. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior"].) Indeed, mother seems to implicitly acknowledge the propriety of monitored visits with Adam when she concedes, in her brief, that the need for monitoring might be greater for Adam than for her other children.

### C. *Elements of case plan*

Mother challenges the juvenile court's case plan ordering her to complete a domestic violence program, to complete a parenting class, and to attend individual counseling addressing how to parent a child with special needs and the effects on children of excessive discipline and domestic violence.

As a threshold matter, mother has forfeited her challenge. Before the juvenile court, mother "submit[ted] to the case plan" without objection, indicating that she was already enrolled in a domestic violence support group, an anger management class, and a parenting class. All mother requested, to "make the case plan less burdensome" on her, is to not be required to attend individual counseling *and* the domestic violence and anger management classes; she expressed a preference to remain in the classes and not participate in individual counseling. By not

13

challenging the parenting classes at all, and by requesting an "either/or" disposition as to the domestic violence program and individual counseling components of her case plan, mother has forfeited her right to challenge the outright imposition of the domestic violence program, parenting class, and individual counseling. (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 672; see also *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886.)

Further, and even if we overlook mother's forfeiture, the juvenile court's case plan was appropriate. A juvenile court "'has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.'" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).) In that vein, the court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) Thus, a court's decision to require a parent to participate in court-ordered services will not be reversed unless that decision is arbitrary, capricious, or patently absurd. (*Briana V.*, at p. 311; *In re L.W.* (2019) 32 Cal.App.5th 840, 851.)

The juvenile court did not abuse its discretion in requiring mother to participate in a domestic violence support group for victims, to attend parenting classes, or to participate in individual counseling aimed at addressing parenting and use of discipline with special needs children like Adam. Each of these requirements is tied to an aspect of mother's conduct that poses a potential danger to the children: The domestic violence support group was aimed at teaching mother how to deal with the violence she suffered and not to carry it forward; the parenting classes and individual counseling worked hand in hand to teach

14

mother how to constructively address disciplinary issues with the children without resorting to violence.

Mother's challenges to these elements of her case plan boil down to two arguments. First, mother asserts that there is insufficient evidence to support the juvenile court's underlying jurisdictional findings for domestic violence, physical abuse, or emotional abuse. As explained above, this is incorrect as to the physical abuse finding we have affirmed. But more to the point, it is irrelevant because elements of a case plan need not be tethered to a specific jurisdictional allegation and need only promote the children's welfare when viewing "the evidence as a whole." (*Briana V.*, *supra*, 236 Cal.App.4th at p. 311; *In re K.T.* (2020) 49 Cal.App.5th 20, 25.) Here, the evidence as a whole is sufficient to warrant the three elements of the case plan mother challenges. Second, mother argues that individual counseling is categorically inappropriate because she is "not suffering from mental health issues." Although individual counseling may be ordered for a parent with mental illness, a parent's mental illness is not a *prerequisite* for individual counseling. Because the individual counseling was tailored to the issues pertinent to the children's best interests, requiring such counseling was not an abuse of discretion.

## III. ICWA

Mother argues that the juvenile court's jurisdictional and dispositional orders must be reversed due to its noncompliance with ICWA. This argument fails because (1) the remedy for ICWA noncompliance in an ongoing dependency case is at most vacation of the ICWA finding (rather than vacation of the jurisdictional and dispositional orders) (e.g., *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567-568), and (2) mother's argument

15

as to why there was noncompliance misreads the record, and thus lacks merit.

### A.   *Pertinent facts*

The Department asked mother, father, and Javier G. whether they had any Native American heritage; all of them said no. All three also filed written forms denying any such heritage. In response to questioning by the juvenile court at the very first hearing in this case, mother and father again denied any heritage. The Department and/or the juvenile court also inquired of the children's possible Native American heritage with both parental grandmothers, the paternal aunt, the maternal grandmother, the maternal great aunt, and each child's schoolteacher; all of them reported no Native American heritage. As a consequence, the court found, at the detention hearing and again at the jurisdictional/dispositional hearing, that ICWA did not apply.

### B.   *Analysis*

ICWA and the corresponding California statutes that our Legislature enacted to implement ICWA assign the juvenile court and the Department three distinct duties aimed at assessing whether a child in a dependency action is an "Indian child," and hence a child who should not be separated from their tribal family through adoption or foster care placement. (§§ 224.2, 224.3; *In re Dezi C.* (2024) 16 Cal.5th 1112, 1131-1134; *Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.) Only the first duty is at issue here—namely, the initial "duty" of the Department and juvenile court "to inquire whether [a] child is, or may be, an Indian child." (§ 224.2, subds. (a) & (b).) The Department discharges this duty by "asking" family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b).)

16

For these purposes, an "Indian child" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b).) The Department's duty to inquire extends not only to the child's parents, but also to others, "includ[ing] . . . extended family members." (§ 224.2, subd. (b); *In re Dezi C.*, at pp. 1131-1132.) For its part, the juvenile court is required, "[a]t the first appearance" in a dependency case, to "ask each party to the proceeding and all other interested persons present . . . whether they know or have reason to know that the child is an Indian child." (§ 224.2, subd. (c); *In re Dezi C.*, at pp. 1129-1130.) We review a juvenile court's finding that ICWA does not apply—and, implicitly, that the Department discharged its initial duty of inquiry under ICWA—for either substantial evidence or a "hybrid" of substantial evidence and an abuse of discretion. (*In re Dezi. C.*, at p. 1134.)

The juvenile court's findings, at the detention and jurisdictional/dispositional hearing, that ICWA does not apply was not erroneous because it was supported by substantive evidence and/or not an abuse of discretion. The juvenile court discharged *its* initial duty of inquiry by asking mother and father (and other relatives who attended the proceedings) whether the children had any Native American heritage. The Department also discharged its duty by asking available family members who might know—as well as the children's teachers—if the children had any such heritage.

Mother urges that the Department erred in not inquiring of the maternal grandmother and maternal great aunt. Mother's argument rests on a misreading of the record. The record

17

indicates that the Department *did* ask the maternal grandmother about the children's possible Native American heritage.  The record also indicates that the Department asked the maternal great aunt, although the Department's report mislabeled her as the maternal aunt; however, the Department's reports make clear that the Department is referring to the same person.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.

HOFFSTADT

We concur:

_____, P. J.

LUI

_____, J.

CHAVEZ